United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 4, 2001 Decided November 6, 2001 

 No. 01-3036

 United States of America, 
 Appellee

 v.

 Chaka Toure Hutchinson, 
 Appellant

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 00cr00255-01)

 A. J. Kramer, Federal Public Defender, argued the cause 
and filed the briefs for appellant. Gregory L. Poe, Assistant 
Federal Public Defender, entered an appearance.

 Patricia A. Heffernan, Assistant U.S. Attorney, argued the 
cause for appellee. With her on the brief were Kenneth L. 
Wainstein, U.S. Attorney, and John R. Fisher, Roy W. 

McLeese III and Roderick L. Thomas, Assistant U.S. Attor-
neys.

 Before: Edwards, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: Chaka T. Hutchinson appeals his 
conviction for unlawful possession of a firearm and ammuni-
tion by a convicted felon on the ground that the district court 
erred in denying his motion to suppress evidence. He con-
tends that the retention of his identification during a Terry 
stop extended his nonconsensual detention longer than was 
necessary to effect the purpose of the Terry stop, and there-
fore was unlawful, requiring suppression of the gun, the 
ammunition, and certain statements that he made. Because 
the district court did not address Hutchinson's argument that 
the scope and duration of the Terry stop was excessive in 
light of police retention of his identification, and hence there 
are no findings of fact essential to decide this legal issue, we 
remand the case to the district court.

 I.

 The police stopped Hutchinson at 13th and Monroe Streets, 
N.W., at about 12:40 a.m. on July 28, 2000. In following up a 
robbery, the police were investigating a stabbing incident that 
arose from the robbery and occurred at around 11:30-11:45 
p.m. on July 27, 2000, at 13th and Kenyon Streets, N.W., 
which is approximately two to three blocks from Monroe 
Street. Around midnight, an eyewitness to the stabbing told 
Detective Hilliard that the person who had done the stabbing 
was a black male, 5'6" to 5'9" tall, wearing dark clothing, with 
a bush hair style pulled back and tied; the eyewitness 
observed the stabbing from about fifty yards away and from 
an elevated position. In response to the eyewitness's report, 
a lookout was broadcast, describing a black male in his 
twenties, about 5'8" tall wearing a dark shirt over dark pants 
and having a bush hair style tied back with a rubber band. 
The lookout stated that the subject was last seen walking 
eastbound in the 1200 block of Kenyon Street, N.W.

 Hilliard first saw Hutchinson walking east on Monroe 
toward 13th Street. Hutchinson wore dark blue pants and a 
white shirt, and was carrying a shoulder bag. He was 28 or 
29 years of age. His hair was in a bush hairstyle, pulled back 
and tied. Although Hutchinson is 6'3" tall, Hilliard, who is 
5'10", thought at the time that Hutchinson was around 5'11" 
or 6' tall. Accompanied by one other officer, Hilliard stopped 
Hutchinson because he believed that he fit the description of 
the individual described in the lookout and no one else in the 
area matched the lookout. One of the officers told Hutchin-
son to put his hands on a fence, which he did. Hutchinson 
then asked "what was going on," and the officer responded 
that he matched a lookout. The officer patted down Hutchin-
son and found nothing. A third officer arrived at the scene 
shortly after Hutchinson was frisked. Hilliard then asked 
Hutchinson from where he was coming and to where he was 
going. Hutchinson said that he had just finished work at 
WPFW, a jazz radio station, and that he was on his way to a 
friend's house on Monroe Street. Hilliard was satisfied with 
Hutchinson's responses, and was "comfortable that this 
wasn't our suspect."

 Hilliard, however, had obtained Hutchinson's identification, 
jotted it down in his notebook, and decided to run it through 
the "WALES" system. After determining that Hutchinson 
"wasn't our suspect," Hilliard started walking toward his 
cruiser to do the "WALES" check, when he said to Hutchin-
son, "You don't have a problem with the officer looking into 
your bag?" Hilliard asked about the bag because Hutchinson 
fit the lookout, having had time to take off a dark colored 
shirt, and the bag would have been a good place to hide the 
shirt and the knife. Hilliard testified that he was comfortable 
that Hutchinson did not appear to be the person for whom 
they were looking, but he could not say for certain that 
Hutchinson was not the stabbing suspect without seeing if he 
had a dark shirt or a knife. Thus, he "just arbitrarily" asked 
Hutchinson about the bag to be sure he did not have "these 
articles" before he was released. When Hutchinson did not 
respond, it "sent back up the red flag" and Hilliard continued 
to his cruiser.

 While still retaining Hutchinson's identification, Hilliard 
was in his cruiser for two to five minutes attempting to run 
the "WALES" check. Hilliard was unable to run the 
"WALES" check, however, and returned to where Hutchin-
son was standing with the two other officers and asked, "Do 
you have a problem with the officer looking in your bag?" 
Hutchinson began taking his bag off his shoulder. Hilliard 
asked, "What's wrong?" Hutchinson replied, "Well, you['re] 
going to lock me up anyway." Hilliard asked, "Well, what's 
wrong? You got a weapon or something in there?" Hutchin-
son replied, "Yeah, I have a gun." The police immediately 
arrested Hutchinson and took the bag. The bag contained a 
sawed-off shotgun. The transport officers observed Hutchin-
son attempting to conceal two shell casings in the transport 
vehicle. Another officer corroborated much of Hilliard's tes-
timony.

 Hutchinson, who was implicated in neither the stabbing nor 
the robbery that preceded it, filed a motion to suppress the 
gun, the ammunition, and his statements. He argued that 
the facts did not justify a Terry stop, because he did not fit 
the lookout description and was walking in the opposite 
direction at a time much later than the stabbing. He also 
argued that the Terry stop had exceeded the scope of the 
purpose of the stop, maintaining that the Terry stop consti-
tuted a custodial situation because Hilliard kept Hutchinson's 
identification, there were three officers present, and Hutchin-
son was commanded to let the police look in his bag. Fur-
ther, Hutchinson argued, because Hilliard was satisfied with 
Hutchinson's responses, there was no need for further investi-
gation. Finally, Hutchinson argued that the police officers' 
questioning constituted custodial interrogation in violation of 
his Fifth Amendment rights. The government responded 
that the lookout was reliable, Hutchinson's location, age, race, 
dark pants and hair style justified the stop, there was only 
investigatory questioning that led to asking for consent to 
search the bag, which Hutchinson effectively gave, and, in any 
event, upon admitting he had a gun, there was probable cause 
to arrest him.

 The district court denied the suppression motion. The 
court concluded that the description was sufficient for a stop 
two or three blocks away from the incident, and that because 
the stabbing involved a knife, a pat down and preliminary 
inquiry regarding the weapon were proper. The court found 
that no weapons were drawn, the police did not use loud 
voices, Hutchinson was not surrounded, and the stop was for 
a short duration on a public street. As to the identification, 
the court relied on United States v. Jordan, 958 F.2d 1085 
(D.C. Cir. 1992), for the standard, "[whether] there [is] a 
reasonable opportunity to review it," and concluded that the 
officers retained Hutchinson's identification for a reasonable 
period of time. Given the circumstances, the court concluded 
that it was a fair inference that Hilliard intended to return 
the identification to Hutchinson but for his admission to 
having a gun. Finally, the court concluded that Hutchinson 
was not in custody--that the encounter was a legitimate 
Terry stop--and that the questioning was reasonably related 
to the purpose of the stop.

 Hutchinson thereafter pleaded guilty to unlawful possession 
on July 28, 2000, of a firearm and ammunition by a convicted 
felon in violation of 18 U.S.C. s 922(g)(1).

 II.

 On appeal, Hutchinson does not contend that his initial stop 
was based on less than reasonable suspicion. Instead, he 
explicitly declined to challenge the stop's propriety at its 
inception in light of United States v. Davis, 235 F.3d 584 
(D.C. Cir. 2000). Because Hutchinson does not challenge the 
lawfulness of his initial stop, the court has no occasion to 
decide whether the facts in the instant case rise to the level of 
reasonable suspicion present in Davis and required by the 
Supreme Court's Terry jurisprudence.

 Hence, the only question on appeal is whether the scope 
and duration of the Terry stop were impermissible. Hutchin-
son contends that the retention of his identification for two to 
five minutes to run a "WALES" check, and the questioning 
that took place during and after that period, resulted in a 

detention that was both longer than necessary to carry out 
the purpose of the stop and beyond the scope of the purpose 
of the stop. Therefore, Hutchinson contends, his statements 
and the physical evidence seized from him during and after 
this time period must be suppressed.

 In Florida v. Royer, 460 U.S. 491 (1983), the Supreme 
Court instructed that:

 an investigative detention must be temporary and last no 
 longer than is necessary to effectuate the purpose of the 
 stop. Similarly, the investigative methods employed 
 should be the least intrusive means reasonably available 
 to verify or dispel the officer's suspicion in a short period 
 of time. It is the State's burden to demonstrate that the 
 seizure it seeks to justify on the basis of reasonable 
 suspicion was sufficiently limited in scope and duration to 
 satisfy the conditions of an investigative seizure.
 
Id. at 500 (citations omitted). In Adams v. Williams, 407 
U.S. 143 (1972), the Court further stated that a "brief stop of 
a suspicious individual, in order to determine his identity or 
to maintain the status quo momentarily while obtaining more 
information," is permissible. Id. at 146.

 Typically, this means that the officer may ask the detain-
 ee a moderate number of questions to determine his 
 identity and to try to obtain information confirming or 
 dispelling the officer's suspicions. But the detainee is 
 not obligated to respond. And, unless the detainee's 
 answers provide the officer with probable cause to arrest 
 him, he must then be released.
 
Berkemer v. McCarthy, 468 U.S. 420, 439-40 (1984) (footnotes 
omitted); see also United States v. Gale, 952 F.2d 1412, 1415 
(D.C. Cir. 1992).

 On appeal, Hutchinson contends that his detention exceed-
ed its allowable limits because Detective Hilliard's suspicions 
based on the lookout had been dispelled, according to Hilli-
ard's testimony, by the time Hutchinson made the incrimina-
ting statements. Hilliard testified that prior to attempting a 
"WALES" check, he was satisfied with Hutchinson's respons-

es to his questions and that Hutchinson was not the subject of 
the lookout. Nonetheless, although the record is unclear 
when and what identification was obtained from Hutchinson, 
the police obtained Hutchinson's identification. There was no 
indication that there was anything wrong with Hutchinson's 
identification. Hutchinson maintains, moreover, that there 
was no evidence that a "WALES" check could have provided 
information that would have helped the police determine 
whether he was the stabbing suspect. Insofar as the record 
reveals, retention of his identification for a "WALES" check 
bore no relation to the purpose of the stop, which was for a 
suspect in a stabbing earlier that night. No evidence was 
offered about what information can be obtained from the 
"WALES" system, much less what the "WALES" system is 
other than some sort of police database. Although running a 
computer check on a driver's license and registration is a 
lawful part of a traffic stop because of the public interest of 
the States in ensuring that only those qualified to do so are 
permitted to operate motor vehicles, see Delaware v. Prouse, 
440 U.S. 648, 658 (1979), Hutchinson maintains that no such 
interest exists with regard to pedestrians. Finally, because 
Detective Hilliard testified that he had copied the information 
in his notebook, there was no need for him to retain Hutchin-
son's identification during the "WALES" check. In Hutchin-
son's view, the fact that the retention of his identification had 
nothing to do with the stop is shown by Hilliard's failure to 
explain why he needed to retain the identification for any 
purpose related to the stop.

 The government's response is that Hutchinson has waived 
the argument that retention of his identification to run the 
"WALES" check exceeded the lawful scope of the Terry stop 
by failing to make it in the district court. See Fed. R. Crim. 
P. 12(f). We disagree. First, Hutchinson's motion to sup-
press challenged the scope of the investigative stop, citing 
both Royer and Terry. Second, Hutchinson elucidated this 
challenge at the suppression hearing, arguing that "[a]n 
investigative detention has to be reasonably related in scope 
to the circumstances which justified the interference in the 
first place. That's Terry, 392 U.S. at 20." He also argued 
that because his match to the lookout description was so 

weak, the permitted scope and duration of the stop "narrowed 
considerably." As part of his challenge to the scope and 
duration of the stop, he further argued: "A key fact is that 
Hilliard asks for and keeps [Hutchinson's] identification" and 
that this "alone is enough to turn this into a custodial 
situation." Although Hutchinson's terminology was not tech-
nically exact because "custodial situation" generally pertains 
to Miranda analyses whereas the issue here was the scope 
and duration of a Terry seizure, Hutchinson, by arguing that 
the officer's retention of his identification impermissibly 
turned the Terry stop into a custodial situation, a higher-
level, more intrusive, Fourth Amendment event, was also 
necessarily arguing that the officer exceeded the permissible 
bounds of the Terry stop. See United States v. Sharpe, 470 
U.S. 675, 685 (1985); United States v. Laing, 889 F.2d 281, 
285 (D.C. Cir. 1989). Third, the district court addressed the 
legal issue of whether the stop had exceeded its permissible 
bounds, and, relying on the legal standard in United States v. 
Jordan, 958 F.2d 1085 (D.C. Cir. 1992), concluded that the 
retention of Hutchinson's identification was not temporally 
significant for purposes of the court's Fourth Amendment 
analysis. Although neither Hutchinson nor the district court 
focused clearly on the distinction between Jordan, in which 
the issue was whether retention of an identification would 
turn an otherwise consensual encounter into a seizure, id. at 
1088-89, and this case, in which Hutchinson's identification 
was retained during a seizure, Hutchinson's citation to Jor-
dan put the issue of whether retaining his identification had 
Fourth Amendment significance before the court, and the 
court seemingly understood that point because it addressed 
the issue.

 It is true that the argument at the suppression hearing 
focused on whether Hutchinson was lawfully stopped initially, 
and whether his statements thereafter were elicited in re-
sponse to custodial interrogation. In his motion, Hutchinson 
argued that by the time he "told the officers that he had a 
gun, the statement was the product of an illegal seizure." 
The government's opposition acknowledged Hutchinson's 
claim that he was unlawfully seized, but did not address 
Hutchinson's impermissible scope argument or his reliance on 

Royer. It is also true that Hutchinson's motion could have 
stated more fulsomely the argument regarding the scope of 
the seizure, as counsel has done in his brief on appeal. But 
for the reasons noted, we conclude that Hutchinson adequate-
ly set forth both the legal ground and factual support for his 
objection, and accordingly, did not waive the scope and dura-
tion claim. See United States v. Mitchell, 951 F.2d 1291, 1296 
(D.C. Cir. 1991); United States v. Bailey, 675 F.2d 1292, 1294 
(D.C. Cir. 1982).

 We nevertheless conclude that remand is required. Hutch-
inson's motion to suppress raised two separate legal ques-
tions. The first question was whether, under Terry, the 
police had articulable suspicion to stop Hutchinson for ques-
tioning. See Royer, 460 U.S. at 498. The district court 
addressed this question, finding that the police had reason-
able grounds to stop Hutchinson and, because the stabbing 
involved a knife, to pat him down and ask him questions in 
connection with the stabbing. The second question was 
whether Hutchinson's seizure was sufficiently limited in scope 
and duration to the circumstances that justified the interfer-
ence with his liberty in the first place. See Royer, 460 U.S. at 
500; Terry, 392 U.S. at 19-20. In order to answer the second 
question, the district court had to make factual findings 
regarding not only the length of time that Hutchinson was 
seized, i.e., held for investigative detention, but also whether 
at some point the investigative detention exceeded the pur-
pose of the initial stop, see Royer, 460 U.S. at 500; United 
States v. Holt, 264 F.3d 1215, 1229-30 (10th Cir. 2001), and 
hence impermissibly extended the duration of the stop. In 
concluding that the duration of the stop was reasonable, 
however, the district court addressed the retention of Hutch-
inson's identification only in temporal terms. The district 
court also should have considered whether the temporal 
duration of the stop was unlawfully extended because the 
police pursued a means of investigation that was beyond the 
scope of the purpose of the stop. See Sharpe, 470 U.S. at 
686; see also United States v. Machuca-Barrera, 261 F.3d 
425, 432 (5th Cir. 2001). The district court did not, however, 
address whether the retention of Hutchinson's identification 

exceeded the permissible scope of the stop to investigate the 
stabbing, and thus unlawfully extended Hutchinson's seizure. 
Hutchinson did not argue in the district court that he was not 
required to surrender his identification, see Oliver v. Woods, 
209 F.3d 1179, 1190 (10th Cir. 2000) (citing Kolender v. 
Lawson, 461 U.S. 352, 361 n.10 (1983)), and does not attempt 
to raise that issue now. But to address the argument he 
made regarding the scope and duration of his detention and 
the retention of his identification, the district court had to 
make findings regarding the purpose of retaining Hutchin-
son's identification, the purpose of the "WALES" check, and 
whether the information available from the "WALES" system 
could have assisted the police in determining whether Hutch-
inson was the stabbing suspect whom they were pursuing. 
Absent such findings, the court was not in a position to 
determine whether the government had met its burden to 
show that Hutchinson's seizure "last[ed] no longer than [wa]s 
necessary to effectuate the purpose of the stop." Royer, 460 
U.S. at 500. Under such circumstances, remand is appropri-
ate. See United States v. Williams, 951 F.2d 1287, 1291 
(D.C. Cir. 1991); see also United States v. Hill, 131 F.3d 
1056, 1060 (D.C. Cir. 1997).

 Accordingly, we remand the case to the district court for 
further factual development about the "WALES" check, and a 
determination whether retention of Hutchinson's identifica-
tion for the purpose of running the "WALES" check was 
related to the purpose of the stop or caused the stop to go on 
for too long, thereby tainting the evidence and statements 
obtained by the police after the attempted "WALES" check.