**UNITED STATES of America,**
**Appellee,**

v.

**Curnell L. DAVIS, Appellant.**

**No. 00–3016.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 14, 2000.

Decided Dec. 29, 2000.

---

A.J. Kramer, Federal Public Defender, argued the cause and filed the briefs for appellant. Gregory L. Poe entered an appearance.

Suzanne Grealy Curt, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher, Thomas J. Tourish, Jr. and Ricardo Nunez, Assistant U.S. Attorneys.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

After police conducting a *Terry* stop-and-frisk discovered a shotgun hidden in his clothing, appellant pled guilty to possession of a firearm by a felon. He appeals the district court's denial of his motion to suppress, arguing, among other things, that the court erred by relying on information police obtained from a citizen 911 call describing a man fleeing the scene of a shooting even though the government failed to produce a tape of the call. Finding that appellant waived this argument, and that his similarity to the 911 caller's description and to witness accounts of the shooter gave police a "reasonable, articulable suspicion" sufficient to justify the stop, *see Illinois v. Wardlow*, 528 U.S. 119, 123,

120 S.Ct. 673, 145 L.Ed.2d 570 (2000), we affirm.

## I

At 11:33 PM on May 31, 1999, a 911 caller reported gunfire and screaming in the 2300 block of North Capitol Street. Minutes later, a police dispatcher sent units to 2308 North Capitol to investigate a "shooting." As police arrived at the scene, the dispatcher relayed additional citizen reports describing two men, one with blood on his clothes and another in khaki shorts and a white t-shirt. At 11:40, the police unit that had arrived at the North Capitol address broadcast its first account of witness reports. Known as a "lookout," the broadcast described the suspect as a man on a bike, dressed all in black, heading north on North Capitol. The unit also relayed witness reports that the "subjects" were in a four-door sedan and that "there seem[ed] to be a grey, small weapon." Updating the lookout two minutes later, the unit described the suspect as a "black male, light skinned, black [unclear], all black, or possibly on a bike, [unclear] carrying a small weapon."

At midnight, about thirty minutes after the shooting, the dispatcher reported that "we have a citizen that's on landline, says the subject is wearing all black, that appears to be running away from 2308 North Capitol. He's on foot, possibly now in the unit block of Channing." Police Lieutenant Taliaferro and his partner investigated and within thirty seconds noticed appellant Curnell Davis, a black man wearing dark blue coveralls, walking with a companion just a block away from where the midnight 911 caller had reported seeing the fleeing man. Stopping and frisking Davis, Taliaferro found a sawed-off shotgun hidden in Davis's clothing. Davis told the police that "it was [his] boy that got shot" and that he needed a gun for protection because the neighborhood was so dangerous. A grand jury indicted Davis for unlawful possession of a firearm by a felon. See 18 U.S.C. § 922(g)(1).

■ Arguing that the police lacked a reasonable suspicion for the stop-and-frisk, see Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Davis moved to suppress both the shotgun and his statements to the police. In response, the government pointed to Davis's similarity to the lookouts and to the midnight 911 caller's description of the man fleeing the crime scene. Although at a status conference the government apparently promised (the record does not contain the transcript) to search for the tape of the midnight 911 call, it failed to produce it at the evidentiary hearing on the suppression motion. Davis's counsel, however, never mentioned the tape's absence at the hearing, focusing both his cross-examination of Taliaferro (the only witness) and his closing argument on ways in which Davis failed to match the descriptions of the shooting suspect. Finding Taliaferro's suspicion of Davis reasonable, the district court denied the suppression motion. Davis pled guilty, reserving his right to appeal. We review the district court's findings of fact for clear error and its conclusions of law de novo. See Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## II

■■ Investigative stops do not run afoul of the Fourth Amendment if they are based on "reasonable, articulable suspicion" of criminal conduct. Wardlow, 528 U.S. at 123, 120 S.Ct. 673. Requiring considerably less than probable cause, Terry stops are constitutional if the police can show a "minimal level of objective justification." INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

Davis argues that in defending the constitutionality of the stop, the government cannot rely on the information supplied by the midnight 911 caller and relayed by the dispatcher to the arresting officer because the government failed to produce the tape of the call. In Whiteley v. Warden, Wyo.

*State Penitentiary,* 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the Supreme Court held unlawful an arrest based on a radio bulletin where the government failed to prove that the bulletin was itself based on probable cause. Later, in *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Court described *Whiteley* as standing for the proposition that "when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest," *id.* at 231, 105 S.Ct. 675; *see also Whiteley,* 401 U.S. at 568, 91 S.Ct. 1031 ("An otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."). *Hensley* also extended *Whiteley* to reasonable suspicion cases. 469 U.S. at 232, 105 S.Ct. 675. Following *Hensley,* in *United States v. Cutchin* we overturned a district court's exclusion of a 911 tape, saying: "What the tape itself revealed went directly to the issue whether the dispatcher had a reasonable, articulable suspicion, without which [the officer's] stop of [the suspect's] car might not have been legal." 956 F.2d 1216, 1217–18 (D.C.Cir. 1992).

■ Relying on these cases, Davis urges us to find that without the 911 tape, the dispatcher's report of the call cannot provide the basis for reasonable suspicion. According to the government, Davis waived this argument because he failed to make it in the district court. *See* FED. R.CRIM.P. 12(f) ("Failure by a party to raise defenses or objections ... at the time set by the court ... shall constitute waiver thereof."). The government's point is well taken. Not once in the district court did defense counsel cite *Whiteley, Hensley,* or *Cutchin,* much less the propositions for which they stand, nor did he complain about the government's failure to produce the 911 tape at the suppression hearing. Counsel focused his entire argu-

ment on trying to persuade the district court that Davis did not match the suspect's description. Contrary to Davis's argument, we do not consider the filing of a general suppression motion sufficient to preserve the 911 tape objection for appeal just because the government bears the burden of proving reasonable suspicion. Neither defense counsel's motion nor his argument could have given the government notice of the importance counsel apparently ascribed to the tape.

■ Given the waiver, we will consider the information provided by the 911 caller in determining whether the police had a reasonable suspicion sufficient to justify the stop. For starters, we agree with Davis that the call, by itself, provides insufficient justification. In *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court considered the validity of a *Terry* stop based on an anonymous tip that a young man standing on a street corner possessed an illegal weapon. Because nothing corroborated the anonymous caller's accusation of criminal activity, the Court held the tip insufficiently reliable to justify the stop. *Id.* at 1380. In this case, the midnight 911 caller made no accusation of criminal activity, reliable or otherwise, reporting only that a subject dressed all in black appeared to be running from 2308 North Capitol. In view of *J.L.,* the information supplied by the call falls far short of what *Terry* requires.

The 911 call, however, was not Taliaferro's only source of information, and we have made it clear that "in judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir. 1976). Taliaferro knew that a shooting had just occurred at 2308 North Capitol and that witnesses had described the shooter as a black male dressed all in black heading north from the crime scene. He also knew that a man matching the description of the suspect in two re-

spects—his clothing and his approximate location (just north of 2308 North Capitol)—had been seen fleeing the crime scene. So when Taliaferro saw Davis, he saw a man heading away from the nearby crime scene who not only matched the 911 caller's description (according to the district court, Davis's dark blue coveralls likely appeared black in the dark) but also matched the police lookouts in yet another respect: his race. This case is thus quite like *United States v. Smart,* 98 F.3d 1379, 1384 (D.C.Cir.1996), where we found sufficient justification for a *Terry* stop based on the criminal suspect's sex, race, clothing, and location. Taliaferro had precisely the same information about the shooting suspect in this case, albeit aggregated from two different sources. To be sure, Davis was with a companion, a fact mentioned in none of the descriptions; he was not riding a bicycle as the lookouts said he might "possibly" be; nor was a "grey, small weapon" visible. Setting aside these minor inconsistencies involving mutable characteristics, however, Davis matched the lookouts and the 911 caller's description sufficiently to supply the reasonable suspicion required by *Terry.*

Davis next argues that Taliaferro's focus on him was unreasonable because the dispatcher provided information about other suspects: a man with blood on his clothes, another in khaki shorts, and several individuals in a four-door sedan. We disagree. *Terry* requires only that the police have a reasonable suspicion of the person actually stopped. In assessing this suspicion, the fact that police have greater reason to suspect a different person is of course relevant. But in this case, the best information the police had—eyewitness accounts of the shooter and a man seen fleeing the scene—pointed to Davis.

While we recognize the need to guard against authorizing broad police sweeps of an undeniably high crime area, *see Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by [criminals], standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."), we need not address that concern here—the police found Davis within a block of a shooting that occurred just thirty minutes earlier and Davis matched the primary suspect in several critical respects. Because Davis makes no independent challenge to the frisk, the district court's denial of the motion to suppress is affirmed.

*So ordered.*