Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 21, 2003   Decided March 9, 2004

No. 02-3043

UNITED STATES OF AMERICA,
APPELLEE

v.

WENDELL P. HOLMES, JR.,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00271–01)

———

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender was on brief. *Neil H. Jaffee*, *Sandra G. Roland*, and *Tony W. Miles*, Assistant Federal Public Defenders, entered appearances.

*David B. Goodhand*, Assistant United States Attorney, argued the cause for the appellee. *Roscoe C. Howard, Jr.*,

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

United States Attorney, and *John R. Fisher, Roy W. McLeese, III*, and *Darryl B. Brooks*, Assistant United States Attorneys were on brief.

Before: EDWARDS, SENTELLE and HENDERSON, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellant, Wendell P. Holmes, Jr., was indicted on one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1] He pleaded guilty after the district court denied his motion to suppress the evidence against him—a Lorcin .38–caliber semi-automatic pistol with a live .38–caliber round in the chamber and three more in the magazine—but reserved his right to appeal the court's ruling. On appeal, he challenges the police search that uncovered the firearm and ammunition, contending the police had no reasonable suspicion to search him and therefore violated his Fourth Amendment right against unreasonable search and seizure. For the reasons discussed below, we disagree and affirm the judgment of the district court.

## I.  BACKGROUND

Shortly before two o'clock a.m. on July 1, 2001, a pedestrian flagged down Metropolitan Police Department (MPD) Officer Walter Fleming while he was patrolling the 900 block of Bellevue Street in Southeast Washington, D.C. in a marked police cruiser.[2] The pedestrian claimed to have seen a man in the area of 869 Bellevue Street brandishing a handgun. He reported that the man wore an orange shirt and tan pants, appeared intoxicated and, once aware of the pedestrian, concealed the weapon. Fleming immediately broadcast a lookout

---

[1] "It shall be unlawful for any person . . . who has been convicted in any court of[ ] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition. . . ."  18 U.S.C. § 922(g)(1).

[2] The facts are based on the evidence presented during the suppression hearing.

for the man and requested assistance before investigating further.

MPD Officer Julian Lamb responded within approximately two minutes of Fleming's radio broadcast. Lamb knew the area as a high crime area, including robberies, burglaries, assaults and shootings. Lamb did not speak to the pedestrian upon arriving on the scene, but overheard him speaking with Fleming. Lamb did observe that the pedestrian was "upset" and "afraid" and noticed "how he was dressed," which observations led Lamb to conclude that he was "a reliable person." Joint Appendix (JA) tab A at 6. After completing his interview of the pedestrian, Fleming told Lamb that the pedestrian said the armed man appeared intoxicated or high. Fleming and Lamb then began canvassing the 800 block of Bellevue Street for the man the pedestrian described.

Lamb first drove approximately 200 feet to an alleyway where the pedestrian claimed to have seen the man. After searching for approximately five minutes, Lamb observed a man—later identified as Wendell Holmes—"crouched down"[3] on the porch of the house at 873 Bellevue Street. JA tab A at 8–9. Holmes was wearing a "reddish orange shirt [and] tan pants."[4] JA tab A at 10. Lamb was about 10 feet away from Holmes when he spotted Holmes but he could not see Holmes (and, in particular, Holmes's hands) clearly, as the lighting in the area was poor, there were no lights on in the house and Holmes was crouching "right at the door" of the house. JA tab A at 9. Apart from Holmes, the pedestrian and Fleming, Lamb did not see anyone else in the 800 block of Bellevue Street during their search.

Upon discovering Holmes, Lamb testified that he was "scared" and "had a real heightened safety concern" for

---

[3] Holmes was either crouching or sitting on the porch. The district court credited Lamb's statement that Holmes was crouching on the porch.

[4] Holmes was wearing either tan shorts or tan pants. The district court credited Lamb's statement that Holmes wore either tan pants or long shorts.

Fleming and himself and for the "general public."  JA tab A at 10.  Both officers, who were in uniform, pointed their guns at him and told him to stand up and put his hands where they could be seen.  Holmes did not respond until the officers had repeated the command "roughly" five times.  JA tab A at 13–14.  When Holmes finally complied, he did so slowly, from which Lamb concluded that he was intoxicated or high. While Fleming conducted a "protective pat-down" of Holmes's person for weapons, JA tab A at 16, Lamb alerted Fleming that he saw the outline of a gun handle beneath Holmes's shirt.  Fleming lifted Holmes's shirt and discovered a loaded Lorcin .38–caliber semi-automatic pistol tucked in his pants near his right hip.

On July 31, 2001 Holmes was indicted on a single count: felon in possession of a firearm.  *See* 18 U.S.C. § 922(g)(1). Holmes moved to suppress the evidence against him, *i.e.*, the Lorcin semi-automatic pistol and the live rounds.  The district court denied his motion, concluding that Holmes's case was on all fours with our decision in *United States v. Thompson*, 234 F.3d 725 (D.C. Cir. 2000), *cert. denied*, 532 U.S. 1000 (2001).  Holmes then entered a conditional guilty plea, reserving his right to appeal.  *See* FED. R. CRIM. P. 11(a)(2) ("With the consent of the court and the government, a defendant may enter a conditional plea of guilty . . . , reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion.").  The district court sentenced Holmes to 33 months' incarceration. Holmes now appeals.

## II.  ANALYSIS

Our review of the district court's ruling is *de novo*.  *United States v. Davis*, 235 F.3d 584, 586 (D.C. Cir. 2000), *cert. denied*, 534 U.S. 860 (2001).  We examine the findings of fact that underlie the trial court's determination for clear error and ascribe "due weight to inferences drawn from those facts by [the] resident judge[ ] and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Following the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, the law is well-established that a law enforcement officer acting on a "reasonable, articulable suspicion that criminal activity is afoot" may, consistent with the Fourth Amendment, briefly detain a suspect for investigation and conduct a limited search of the suspect's outer clothing for weapons. *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000); *see Terry*, 392 U.S. at 27, 30. Reasonable suspicion is not a " 'finely-tuned standard[ ],' " *Ornelas*, 517 U.S. at 696 (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)); instead it is a "fluid concept[ ]" that derives "substantive content from the particular context[ ] in which [it is] being assessed." *Ornelas*, 517 U.S. at 696. The standard is dependent on "both the content of information possessed by police and its degree of reliability," *Alabama v. White*, 496 U.S. 325, 330 (1990), and "requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123; *see also White*, 496 U.S. at 330. The reasonable suspicion standard requires us, then, to determine whether Officers Lamb and Fleming had "a minimal level of objective justification," *Wardlow*, 528 U.S. at 123; *see also White*, 496 U.S. at 329–30, for the *Terry* stop of Holmes based on " 'the totality of the circumstances—the whole picture.' " *White*, 496 U.S. at 330 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). We give "due weight" not to the officers' "inchoate and unparticularized suspicion" but to the "specific reasonable inferences which [they are] entitled to draw from the facts in light of [their] experience." *Terry*, 392 U.S. at 27. Moreover, we view the matter from the perspective of " 'an objectively reasonable police officer' " without regard to "the actual motivations of the individual officers involved." *United States v. Hill*, 131 F.3d 1056, 1059 (D.C. Cir. 1997) (quoting *Ornelas*, 517 U.S. at 696).

Holmes contends that the district court was obligated, under the Supreme Court's decision in *Florida v. J.L.*, 529 U.S. 266 (2000), to suppress the gun and ammunition. In that case, the Miami–Dade County police received a telephone call from an anonymous tipster who reported that "a young black male standing at a particular bus stop and wearing a plaid

shirt was carrying a gun." *Id.* at 268. When police officers arrived at the bus stop, they saw three black men, one of whom, J.L., was wearing a plaid shirt. *Id.* One of the officers then frisked J.L. and found a gun in his pocket. *Id.* On these facts, the Court held that the unknown caller's "bare-boned" tip did not provide sufficient "indicia of reliability" to justify a *Terry* stop-and-frisk because "[a]ll the police had to go on . . . was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 269, 271. That the tip accurately described J.L.'s location and appearance did not suffice, according to the Court, because those benign details failed to reveal "that the tipster ha[d] knowledge of concealed criminal activity." *Id.* at 272. The Court explained that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.*

Following *J.L.*, we decided *United States v. Thompson*, 234 F.3d 725 (2000), *cert. denied*, 532 U.S. 1000 (2001), which the district court here found to be a closer fit with Holmes's case. *See id.* at 727–30. In *Thompson*, two police officers were approached by an "anxious and agitated" motorist who related that he "just saw" a man who was wearing "dark pants and a bright orange shirt" and carrying a gun exit a sport-utility vehicle in the nearby parking lot of a closed restaurant. *Id.* at 726–27. The officers drove to the parking lot, where they discovered a man who fit the motorist's description. *Id.* at 727. According to the officers, the suspect was "looking around the edge of [a] fence toward a night club." *Id.* Fearing that the suspect was armed, one of the officers—his weapon drawn—approached and stopped him. *Id.* Upon frisking him, the officer found a cocked and loaded nine-millimeter semi-automatic pistol jammed in his waistband. *Id.*

The court in *Thompson* explained that "the tip in this case bears indicia of reliability beyond those of the anonymous tip in *J.L.*; and the police themselves observed [the suspect] engaging in suspicious conduct." *Id.* at 729. The court found

the motorist's tip more reliable than the one supplied by the unknown caller in *J.L.*, first, because the motorist informed the police in person, "making his report inherently more trustworthy." *Id.* The motorist claimed to have just seen the armed man which, the court concluded, signaled not only that his knowledge involved first-hand observation but that the "recency and the proximity" of the observation indicated it would "prove accurate" as well. *Id.* The court also found the motorist more accountable than the unknown caller in *J.L.* because he "subjected himself to ready identification by the police when he approached them in his car." *Id.* Because the officers had only to ask the motorist for identification or record his license plate number, the motorist risked possible criminal prosecution had he fabricated his report. *Id.* (citing D.C. Code Ann. § 4–151).

The court in *Thompson* further distinguished *J.L.* based on the officers' own observations of the suspect's "clearly suspicious" behavior. *Id.* The officers saw the suspect "concealing himself behind the fence and peering out toward the street" in the parking lot of a closed restaurant at three o'clock in the morning, all of which, viewed from the perspective of an objectively reasonable police officer, was "furtive conduct . . . not merely consistent with the tip that he had a weapon; it would have signaled a reasonable police officer that [he] was positioning himself to use it." *Id.* at 729–30.

We believe the *Thompson* scenario closely resembles the one under review. First, the pedestrian approached Fleming in order to offer his tip in person, thus making it "inherently more trustworthy," *id.* at 729, than the "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information." *J.L.*, 529 U.S. at 271. The pedestrian also supplied the police with an eye-witness account of criminal activity. *See Thompson*, 234 F.3d at 729. He made clear to Fleming that his knowledge was "based upon firsthand observation" by telling Fleming that he "had observed a man with a gun." *Id.*; *see also Gates*, 462 U.S. at 234 (informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was ob-

served first-hand, entitles his tip to greater weight than might otherwise be the case"). Furthermore, because the pedestrian was still present when Lamb arrived on the scene, Lamb also had an opportunity to assess his demeanor and concluded that he was a reliable source of information.[5] *Cf. United States v. Valentine*, 232 F.3d 350, 355 (3d Cir. 2000) ("[A] court may deduce that the officers thought the tipster's demeanor, voice, and perhaps a host of other factors supported the reliability of the tip."), *cert. denied*, 532 U.S. 1014 (2001).

Holmes argues that, unlike in *Thompson*, where the "recency and the proximity of [the motorist's] claimed observation further suggested that it would prove accurate," 234 F.3d at 729, the record here does not indicate that the pedestrian told the police "*when* he saw a man with a gun." Appellant's Br. at 11 (emphasis added). According to Holmes, the district court clearly erred in finding that the "temporal proximity between the observation and the tip was very strong in this case[,] as it was in *Thompson*." Appellant's Br. at 11. We do not agree. While the record does not reveal the precise length of time between when the pedestrian saw Holmes with a gun and when he reported it to Fleming, the record does contain details from which we can infer that the pedestrian's observation occurred only a short time before he reported it. First, Lamb appeared on the scene—only two minutes after Fleming broadcast the lookout—to find a witness who was noticeably upset and afraid; that the pedestrian remained shaken from his encounter with Holmes when Lamb arrived suggests that the encounter had occurred only a short time earlier. Second, Lamb began searching where the pedestrian reported he had seen Holmes and found Holmes only a few doors away from where the pedestrian had reported seeing him.

---

[5] Holmes claims that the district court "improperly placed the burden of proving reliability on [him] in finding that [his] counsel 'did not cross-examine' regarding" Lamb's statement that the pedestrian was reliable. Appellant's Br. at 14. The district court's comment, however, simply reflected its view that Holmes had not adduced any evidence undermining the officer's conclusion.

Holmes also claims that the pedestrian was not as accountable (and therefore not as reliable) as the motorist in *Thompson* because he "approached the police in person but not in a car, so that the officers would not have been able to identify him by writing down a license plate number." Appellant's Br. at 12. While the officers in *Thompson* could have learned the motorist's identity from a source unavailable here—the license plate number—the pedestrian similarly "place[d] his anonymity at risk," *J.L.*, 529 U.S. at 276 (Kennedy, J., concurring), by "subject[ing] himself to ready identification by the police." *Thompson*, 234 F.3d at 729. The pedestrian approached Fleming and remained on the scene until Lamb arrived; thus, either officer could easily have asked him for identification. That they apparently chose not to do so does not negate the fact that by personally supplying information "immediately verifiable at the scene," *Adams v. Williams*, 407 U.S. 143, 146 (1972), the pedestrian faced some risk had the tip proved bogus. *See* D.C. CODE. ANN. § 5–117.05 (false or fictitious report regarding commission of crime made knowingly punishable by fine "not exceeding $300 or by imprisonment not exceeding 30 days"); *see also Thompson*, 234 F.3d at 729; *see generally Gates*, 462 U.S. at 233–34 ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary."); *Adams*, 407 U.S. at 146–47 ("The informant here came forward personally to give information that was immediately verifiable at the scene . . . [and] might have been subject to immediate arrest for making a false complaint had [the officer's] investigation proved the tip incorrect."); *United States v. Christmas*, 222 F.3d 141, 144 (4th Cir. 2000) ("[A] witness who directly approaches a police officer can also be held accountable for false statements."), *cert. denied*, 531 U.S. 1098 (2001).

In a final effort to distinguish *Thompson*, Holmes challenges the district court's conclusion that the officers independently observed Holmes engaged in suspicious behavior. Appellant's Br. at 14. Holmes contends that the court's conclusion is without support once its clearly erroneous finding

that Holmes was "peering around or through ... the fence rail or something," JA tab A at 40, is removed from the "totality of the circumstances." *White*, 496 U.S. at 330 (quoting *Cortez*, 449 U.S. at 417). Holmes is correct that there is no evidence in the record that he was peering around or through anything when Lamb spotted him. The district court appears simply to have inadvertently uprooted this fact from *Thompson* and transplanted it here. *See Thompson*, 234 F.3d at 727, 729. The district court clearly erred in so doing.[6]

Without this particular detail, Holmes's conduct—as observed by Lamb and Fleming—was less suspicious than the suspect's in *Thompson*. *See id.* at 729–30. When Lamb located Holmes, Holmes was crouched down "right at the door" of a darkened residence at approximately two o'clock in the morning in a neighborhood where Lamb had personally responded in the past to violent crimes. JA tab A at 7–9, 35. These facts, without more, would not necessarily arouse the suspicion of an "objectively reasonable police officer." *Ornelas*, 517 U.S. at 696; *cf. Wardlow*, 528 U.S. at 124 (that stop occurs in high crime area is "among the relevant contextual considerations in a *Terry* analysis" (citing *Adams*, 407 U.S. at 144, 147–48)). But Holmes's failure to obey the officers' repeated command, while tending to corroborate the pedestrian's report that Holmes was inebriated, could also have been viewed as suspicious, and even dangerous, by a reasonable officer. *See Thompson*, 234 F.3d at 729–30; *see also United States v. Johnson*, 212 F.3d 1313, 1317 (D.C. Cir. 2000) ("[B]y the time the stop actually took place, it was supported by [the suspect's] continued furtive gestures in response to being confronted by a police officer, and that was suspicious enough to support a reasonable belief that [the suspect] may have been engaged in criminal activity.").

Given that the officers had already drawn their weapons and therefore accomplished the *Terry* stop before Holmes's

---

[6] The government concedes the error. *See* Appellee's Br. at 21 & n.7 ("It is true that there is no evidence that [Holmes] was 'peering around' anything when Lamb came upon him.").

suspicious behavior,[7] that behavior cannot be relied upon to support the stop. *See Ornelas*, 517 U.S. at 696 ("The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search. . . ."); *Terry*, 392 U.S. at 21–22 (reasonableness of seizure must be evaluated in light of "the facts available to the officer at the moment of the seizure"). But neither is such reliance necessary. *See, e.g.*, *J.L.*, 529 U.S. at 272 (reasonable suspicion "requires that a tip be reliable in its assertion of illegality"); *White*, 496 U.S. at 332; *Adams*, 407 U.S. at 146–47. In *White*, the Supreme Court upheld the stop based on the reasonable suspicion resulting from a reliable tip with no suggestion that there was any further suspicious behavior on the defendant's part. 496 U.S. at 332. Similarly, even *J.L.*, which suppressed the evidence because of an invalid *Terry* stop, did so because of a lack of indicia of reliability regarding the tip, not because of the lack of any further suspicious behavior by the defendant. *See* 529 U.S. at 271–72. Accordingly, even if *Thompson* is distinguishable, the distinction makes no difference.

Finally, Holmes contends that the police acted unreasonably in failing to investigate the pedestrian's tip further before stopping Holmes. Appellant's Br. at 14–15. Holmes speculates that had the officers only observed him longer or simply questioned him, they might have learned that his "presence outside a residence at that date and hour" resulted from "a lack of air conditioning, . . . an inability to sleep, or a desire to enjoy a summer Saturday night outside." *Id.* at 15. Following a reliable report in their late-night investigation of an inebriated man with a gun in a high crime neighborhood, however, the officers had ample cause to act as they did. *See Thompson*, 234 F.3d at 729–30. Nothing in the reasonable suspicion standard requires a law enforcement officer to

---

[7] *But see California v. Hodari D.*, 499 U.S. 621, 625–29 (1991) (seizure not effected until officer tackled suspect, despite officer's prior show of authority); *Johnson*, 212 F.3d at 1316–17 (seizure not effected where officer made show of authority but suspect continued to make "shoving down" motions, "gestures that were the very opposite of complying with" officer's order).

perform his duties in a way that risks his safety and that of the community he serves in the hope that all is well despite reliable information to the contrary. *See Adams*, 407 U.S. at 147–48 ("While properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a high-crime area at 2:15 in the morning, [the officer] had ample reason to fear for his safety."); *see also Christmas*, 222 F.3d at 145 ("Officers . . . are entitled to investigate [citizens'] reports without jeopardizing their personal safety."); *cf. Thompson*, 234 F.3d at 730 ("To ask more of the police in these circumstances . . . might well preclude them from interceding before the suspect has accomplished his violent, perhaps lethal, purpose.").

\* \* \*

For the foregoing reasons, the judgment of the district court is

*Affirmed.*