# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 17, 2008          Decided March 11, 2008

No. 06-3075

UNITED STATES OF AMERICA,
APPELLEE

v.

JAMAL ABDUS-PRICE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 05cr00123-01)

———

*Rita B. Bosworth*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III* and *Mary B. McCord*, Assistant U.S. Attorneys.

Before: GINSBURG, ROGERS, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Can the target of a *Terry* stop defeat the legality of his seizure by pointing to a slight color discrepancy between the car in which he was traveling and a crime victim's description of that vehicle? We hold that he cannot, so long as the remaining points of similarity support a reasonable suspicion that the target was involved in criminal activity. The investigative seizure and subsequent protective frisk at issue in this case did not violate the Fourth Amendment.

## I.

On the evening of March 9, 2005, Sergeant Dennis Hance and other Metropolitan Police Department ("MPD") officers heard the following radio broadcast:

> Lookout for an armed robbery that occurred on Today's date 19:35 hours, 1300 block of Florida Avenue NE. Lookout for a Number One black male, 19 years of age 5' 11' 200 lbs, dark-complected. He'se wearing a black North Face jacket, black pants, black shoes. This individual had a light mustache. Number two black male was a pasanger; he'se about a16, 17 years of age, 150 lbs, medium complexion. He has a black and red North Face, a new one with North Face on the sleeve and on the back of the jacket. This individual is armed with a silver-colored hand gun. Stolen from one of the complainants was a black (inaudible) blue North Face jacket, black Nike's, and a CD player. Suspects were last seen inside a Crown Vic Ford model, tan on the side, black on top with smoked-out windows, year between 94 and 97. Last seen Westbound on Florida and Northbound on Trinidad. Radio Run Tr. (Mar. 9, 2005) (errors in original).

At 8:14 p.m., less than forty minutes after the robbery, Sergeant Hance spotted a Ford Crown Victoria with dark-tinted windows, dark blue in color with a white driver's-side rear door, roughly two blocks from the scene of the crime. Reasoning that the car basically matched the lookout description and was in the general area where the robbery occurred, Sergeant Hance pulled over the car. MPD Officer Milner quickly arrived at the scene in response to Sergeant Hance's call for backup, and MPD Officers Monk and Gaumond appeared shortly thereafter.

Traveling in the stopped car were Jamal Abdus-Price, the passenger, and Jamaal Harris, the driver. Officers later described Abdus-Price as a dark-skinned black male between 18 and 30 years old, weighing about 200 pounds, and wearing a black North Face jacket. Harris was described as a stocky, light-skinned black male wearing a North Face jacket. Sergeant Hance and Officer Milner asked Abdus-Price and Harris to exit the vehicle, explaining that they had been stopped because their car fit a description from a radio lookout for an armed robbery. When the officers informed the occupants that they would be patted down for officer safety, Harris complied but Abdus-Price's "eyes got big." Motions Hearing Tr. at 7:21–25 (Oct. 24, 2005). Abdus-Price tried to run away, prompting Officer Milner to grab him in a bear hug. In so restraining the suspect, Officer Milner felt the handle of a gun in the pocket of Abdus-Price's jacket and warned his colleagues. A scuffle ensued. The officers eventually subdued Abdus-Price and, in an effort to avoid accidentally discharging the loaded and cocked weapon, cut open his jacket to retrieve a .22-caliber Beretta handgun.[1]

---

[1] Harris told a different story, but the district court credited the officers' testimony over Harris's. Abdus-Price does not challenge the district court's factual determination.

Officer Monk arrested Abdus-Price for carrying a pistol without a license. Before departing with their prisoner, the officers conducted a show-up procedure to determine whether the victims of the armed robbery that had occasioned the stop could identify Harris or Abdus-Price as the robbers. The victims could not, and Harris was allowed to leave.

Abdus-Price was indicted for unlawful possession of a firearm and ammunition by a felon, a violation of 18 U.S.C. § 922(g)(1). He moved to suppress the weapon seized during the stop that led to his arrest, arguing that the officers violated the Fourth Amendment. After two days of evidentiary hearings, the district court denied the suppression motion in an oral ruling, finding that the car "basically met the description of the vehicle used by the robbery suspects" and concluding that Sergeant Hance thus had reasonable articulable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), to justify his decision to pull over the vehicle. Plea Hearing Tr. at 15:5–10 (Jan. 26, 2006).

Abdus-Price subsequently entered a conditional plea of guilty, reserving his right to appeal the denial of his suppression motion. The district court sentenced him to forty-six months' incarceration followed by three years' supervised release, and imposed fines and special assessments totaling $1,100. Abdus-Price appeals the denial of his suppression motion. We have jurisdiction under 28 U.S.C. § 1291.

## II.

The Fourth Amendment protects against unreasonable seizures of the person. U.S. CONST. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . .").

Stopping the car in which Abdus-Price was traveling was a seizure within the meaning of the Fourth Amendment. *Brendlin v. California*, 127 S. Ct. 2400, 2406–07 (2007). Abdus-Price argues that there was not reasonable suspicion under *Terry* to justify the stop. We consider the issue de novo. *United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

Under the Fourth Amendment, a police officer may effect a brief seizure for investigative purposes — a *Terry* stop — if he has "a reasonable suspicion, grounded in specific and articulable facts, that a person . . . was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), we held that the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."). Reasonable suspicion exists if "the totality of the circumstances" presents "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). This is not a particularly high bar: "a *Terry* stop requires only a 'minimal level of objective justification.' " *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

The facts that led Sergeant Hance to stop Abdus-Price were sufficient to "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 22 (citation and quotation marks omitted); *see also United States v. Smart*, 98 F.3d 1379, 1384 (D.C. Cir. 1996) (asking "whether a reasonable officer in those circumstances would have been suspicious") (citation omitted). An MPD radio

lookout implicated the occupants of a particular automobile in an armed robbery. There were several points of similarity between the car described in that lookout and the car in which Abdus-Price was traveling. The lookout referred to a Ford Crown Victoria with "smoked-out windows," two occupants, and a top that was darker in color than the side. Sergeant Hance pulled over a Ford Crown Victoria with tinted windows, two occupants, and a door that was lighter in color than the top of the car, and did so less than forty minutes after the robbery within a few blocks of the crime scene. To borrow a phrase from our opinion in *United States v. Simpson*, "a confluence of such factors will be sufficient to justify a *Terry* stop." 992 F.2d 1224, 1226 (D.C. Cir. 1993) (upholding stop of suspect who "was wearing clothing similar to that described by the victim, was of the same general age group . . . , was of the same race and physical build of the alleged rapist, and was in the vicinity of the crime").

Abdus-Price urges us to focus on the difference between the car described in the lookout and the car in which Abdus-Price was traveling. The lookout specifically referred to a Ford Crown Victoria that was "tan on the side, black on top," while Sergeant Hance pulled over a Ford Crown Victoria that was dark blue with a white driver's-side rear door. Abdus-Price contends that a reasonable officer would have abandoned pursuit of the two-toned Crown Victoria in which he was riding upon noticing this discrepancy. But this is not what the law requires. In *United States v. Davis*, 235 F.3d 584 (D.C. Cir. 2000), police received a radio lookout describing a shooting suspect "dressed all in black." *Id.* at 586. Responding to this cue, officers stopped a man in dark blue coveralls. A subsequent frisk uncovered a sawed-off shotgun, leading to a conviction under 18 U.S.C. § 922(g)(1). Despite the color discrepancy between black and dark blue clothing, we held there was reasonable suspicion to support the stop

and frisk that uncovered the shotgun. *Davis*, 235 F.3d at 588. The lesson of *Davis* is that a precise color match to a lookout is not an indispensable element of reasonable suspicion.

In the matter before us, it is easy to imagine confusing a dark-blue-and-white car for a black-and-tan car after night has fallen. *Cf.* Motions Hearing Tr. at 22:21–25 (Nov. 3, 2005) (noting statement by the district court to this effect). This much will be obvious to anyone who has dressed before daybreak and arrived at the office wearing mismatched socks. And the usual morning routine does not involve getting dressed at gunpoint. As Officer Milner testified, "if you are interviewing complainants, and there's a gun involved, they're not going to give you an accurate description." Motions Hearing Tr. at 20:7–9 (Oct. 24, 2005). A reasonable officer would be entitled to infer, on the basis of his or her experience, that the victim of an armed robbery might not exercise perfect recall of the color of the robbers' getaway car. *See United States v. Arvizu*, 534 U.S. 266, 273–74 (2002) (noting that officers are entitled to draw on specialized experience and training in arriving at reasonable suspicion).

Given the other matches between the lookout description and the stopped car (i.e., make and model, tinted windows, number of occupants, dark-colored top with light-colored side), the one near-miss involving a detail of color was not enough to dispel Sergeant Hance's reasonable suspicion that he had spotted the robbers described in the lookout. Reasonable suspicion can survive in the face of discrepancies between the vehicle described and the vehicle stopped. *See, e.g.*, *United States v. Hurst*, 228 F.3d 751, 756–57 (6th Cir. 2000) (finding reasonable suspicion supported stop of dark blue Mercury Cougar, where report described dark-colored Ford Thunderbird); *Umanzor v. United States*, 803 A.2d 983, 993 (D.C. 2002) (finding reasonable suspicion supported stop

of blue Honda, where lookout described gray Honda); *cf. Bailey v. United States*, 389 F.2d 305, 309 (D.C. Cir. 1967) (holding probable cause supported stop of 1954 Chevrolet, where lookout described 1953 Chevrolet). As noted in a leading treatise, "investigating officers must be allowed to take account of the possibility that some of the descriptive factors supplied by victims or witnesses may be in error." 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(g) at 557 (4th ed. 2004).

In demanding a perfect match to a lookout description, Abdus-Price is asking us to fast-forward the criminal process to the jury trial phase. This we cannot do. *Terry*'s reasonable suspicion standard demands less of the government than the preponderance standard, *see Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), which in turn demands less than the reasonable-doubt standard, *see Addington v. Texas*, 441 U.S. 418, 423–24 (1979). Abdus-Price probably could not have been convicted of an armed robbery based solely on the appearance of the car in which he was traveling — "[f]rom a hundred rabbits you can't make a horse, a hundred suspicions don't make a proof." FYODOR DOSTOEVSKY, CRIME AND PUNISHMENT 399 (Constance Garnett trans., Heritage Club 1938) (1866). But Sergeant Hance was not convicting Abdus-Price, nor even arresting him, when he pulled him over. "[A] *Terry* stop requires only a minimal level of objective justification, and an officer may initiate one based not on certainty, but on the need to check out a reasonable suspicion." *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (citations and quotation marks omitted). Based on its similarity to the car described in the armed-robbery lookout, Sergeant Hance had reasonable suspicion that the occupants of the two-toned Crown Victoria were "involved in or [were] wanted in connection with a completed felony." *Hensley*, 469 U.S. at 229. Therefore, Sergeant Hance's

decision to stop that car did not violate Abdus-Price's Fourth Amendment right against unreasonable seizures. *Id.*

## III.

Abdus-Price further contends that even if the stop was legal at its inception, the officers violated his Fourth Amendment rights by conducting a protective frisk of his person. We decide de novo whether there was reasonable suspicion supporting this *Terry* frisk. *United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

Before an officer may conduct a protective frisk of a suspect, "he must first have a right not to avoid him but to be in his presence." *Terry*, 392 U.S. at 32 (Harlan, J., concurring). But once he has lawfully engaged a person for investigative purposes, "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972). The cases describe an officer's permissible protective steps. He may compel stopped motorists to step out of the car to prevent their surreptitious retrieval of weapons. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (regarding drivers); *Maryland v. Wilson*, 519 U.S. 408, 410, 415 (1997) (regarding passengers). He may then conduct a protective frisk for weapons if he has reasonable suspicion that the stopped individuals are armed and dangerous. *See Terry*, 392 U.S. at 30; *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004). His reasonable suspicion may be based on reliable reports from others. *See Adams*, 407 U.S. at 147–48; *United States v. Diggs*, 522 F.2d 1310, 1313–14 (D.C. Cir. 1975).

Sergeant Hance and his MPD colleagues prudently employed such protective measures. The officers, believing that they had stopped the car used in a recent armed robbery and aware that one of the robbers had been armed with a silver handgun, approached the situation with caution. The officers asked Abdus-Price and Harris to exit the vehicle for safety reasons, as was their prerogative. *See United States v. Bullock*, 510 F.3d 342, 344–45 (D.C. Cir. 2007) (describing the "bright-line rule" allowing officers to order drivers and passengers to exit a stopped vehicle). Armed with reasonable suspicion of danger by the very nature of the suspected crime of armed robbery, the officers initiated protective frisks of both men. *See id.* at 345–48 (holding that a person suspected of a violent crime is necessarily suspect as being armed and dangerous). Upon learning that a frisk was forthcoming, Abdus-Price added to the officers' reasonable suspicion by attempting to escape. There can be no doubt that, at the moment they frisked Abdus-Price and discovered his illegal weapon, the MPD officers had reasonable suspicion to support a *Terry* frisk of his person. *Terry*, 392 U.S. at 30.

Without seriously contesting any of the foregoing, Abdus-Price nevertheless urges that the protective frisk was unlawful. He argues that the officers should have released him and Harris without frisking them, due to the dissipation of whatever reasonable suspicion may have initially justified the stop. In this idealized retelling of the night's events, Sergeant Hance would have stopped the Crown Victoria, realized that these were not the armed robbers described in the lookout, and immediately ended the interaction. In support of this theory, Abdus-Price points to facts in the record suggesting that he and Harris were not the robbers. First, the lookout described stolen items like a CD player and black Nike shoes, but the officers did not look to see if these were visible within the car. Second, the lookout described the

passenger as a 150-pound teenager with a black-and-red North Face jacket and medium complexion, while Abdus-Price was described by Officer Milner as a dark-skinned, 200-pound man between 18 and 30 years of age and without any red on his North Face jacket. Third, despite a nearly forty-minute lapse between the robbery and the stop, Harris and Abdus-Price were found in a car within a two-minute radius of the scene of the crime.

This dissipation argument fails because reasonable suspicion supporting the stop did not dissipate until after the frisk had occurred. We begin by rejecting the frivolous argument concerning the stolen items; without x-ray vision, the officers could not rule out the possibility that the loot was hidden in the car. Next, we reject the argument concerning physical descriptions because both men broadly resembled the robbers in the lookout description; Abdus-Price, in particular, almost completely matched the description of the driver. Finally, it is not clear that a reasonable officer necessarily would assume that the robbers, upon completing their crime, would make a run for the border. Perhaps these plunderers were working a particular neighborhood? Perhaps they thought their victim had refused to speak to the police and that, after almost forty minutes, the danger of apprehension had passed?

The facts of this case are thus distinguishable from those of *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006), upon which Abdus-Price principally relies. In *Edgerton*, an officer stopped a driver because her temporary license tag was illegible to the officer, a potential violation of state traffic laws. Once the officer left his car, however, he was able to read the tag and confirm that no violation had occurred. The officer nevertheless took the driver's license and registration, obtained her consent to search the car, and eventually found

cocaine. The Tenth Circuit suppressed the drugs, holding that the officer should have sent the motorist on her way upon realizing that the temporary license tag was valid. *Id.* at 1051 (citing *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994)). Unlike *Edgerton*, in which the justification for the stop clearly dissipated upon reading a license tag, our case is murky. Even if some details from the MPD officers' stop did not square with the lookout, there was nothing about the interaction with Abdus-Price and Harris that dispelled the officers' reasonable suspicion they were the robbers. This is in part attributable to the nature of the crimes at issue in *Edgerton* and in this case. The entirety of the crime of unlicensed driving exists within the borders of a car's license tag, while the indicia of armed robbery are not confined to the vehicle. Reasonable suspicion did not dissipate until the show-up failed to implicate Harris and Abdus-Price in the robbery, by which time the lawful frisk had already uncovered a weapon.

Abdus-Price also suggests that, even if the officers' suspicion did not dissipate when he exited the car, the officers should have conducted a thorough investigation — complete with questioning, peering through car windows, and analyzing complexion — before taking steps to ensure officer safety. Abdus-Price gets it backwards. An officer with a reasonable fear that his suspect is armed can take reasonable steps to protect himself, and should do so before he sets about investigating the crime that occasioned a stop. On cross-examination, Sergeant Hance understandably balked at defense counsel's suggestion that further investigation was in order: "Well, I don't usually walk up to the car and stick my head in the car and try to find out whether they match a perfect description when I am dealing with a robbery suspect. . . . And for my safety, I don't — whether or not he was a white male or a green male, it doesn't make any difference —

or a black male. That car fit the description, basically, and I was protecting myself." Motions Hearing Tr. at 26:5–7, 26:19–22 (Nov. 3, 2005). That a protective frisk takes precedence over such investigation of criminal activity is encapsulated in Justice Harlan's memorable phrase: "There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet." *Terry*, 392 U.S. at 33 (Harlan, J., concurring).

Finally, Abdus-Price claims that the *Terry* stop at issue in this case "was the functional equivalent of a full-blown arrest." Appellant's Br. at 21 n.2. We need not consider this suggestion, as it was not presented to the district court. *See District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

## IV.

Officers had reasonable suspicion to support the *Terry* stop of Abdus-Price and further reasonable suspicion to support the *Terry* frisk of his person. Accordingly, there was no Fourth Amendment violation and no reason to grant a motion to suppress. The judgment of the district court is

*Affirmed.*